UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| WILLIAM A. SHELTON | ) | |
| | ) | |
| v. | ) | 1:10-cv-236 |
| | ) | *Chief Judge Curtis L. Collier* |
| DAVID R. OSBORNE, WARDEN | ) | |

## <u>MEMORANDUM</u>

William A. Shelton ("Petitioner"), a prisoner confined at Morgan County Correctional Complex in Wartburg, Tennessee, filed a *pro se* petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Court File No. 2). Following a jury trial, Petitioner was convicted of one count of first degree murder for stabbing and killing Brian Hyatt, the man whom he believed was having an affair with his wife; three counts of false imprisonment (of Charlene Hyatt, Brian Hyatt, Jr., and Shera Holt); and two counts of vandalism of property [Addendum No. 1, Vol. 5, pp. 463-464]. Petitioner received a total effective sentence of life imprisonment in the Tennessee Department of Corrections. Petitioner's convictions and sentence were affirmed by the Tennessee Court of Criminal Appeals on November 9, 2006. *See State v. Shelton*, No. E2005-02014-CCA-R3-DC, 2006 WL 3246100 (Tenn. Crim. App. Nov. 9, 2006), *app. denied*, (Tenn. March 12, 2007). Petitioner petitions this Court for review of those Bradley County convictions and that sentence, basing his effort for relief on four alleged instances of denial of effective assistance of counsel.

David R. Osborne, ("Respondent") Warden of the facility where Petitioner is housed, filed an answer to the petition pursuant to Rule 5 arguing the petition should be dismissed because the state court's conclusion that Petitioner was not denied effective assistance of counsel is not contrary to, or an unreasonable application of, clearly established federal law.

After considering the filings of Petitioner and Respondent, the record of the state proceedings, and the applicable law, the Court will **DISMISS** Petitioner's § 2254 petition (Court File No. 2).

## I.        STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. *See* Title 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Proceedings in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. After carefully reviewing the required materials, the Court finds it unnecessary to hold an evidentiary hearing

Federal courts, pursuant to 28 U.S.C. § 2254(d) which is a part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review decisions of the state courts. This statute limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

Ordinarily when state courts issue orders denying relief without discussing the applicable law, this Court must "'conduct an independent review of the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented.'" *Brown v. Pitcher*, 19 Fed.Appx. 154 (6th Cir.2001) (unpublished table decision), *available in* 2001 WL 700858, at *2,) (quoting *Harris v. Stovall,* 212 F.3d 940, 942 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001)), *cert. denied*, 534 U.S. 1057 (2001. "'That independent review, however, is not a full, *de novo*, review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.'" *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001),(quoting *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000), *cert. denied*, 532 U.S. 947 (2001)), *cert. denied*, 534 U.S. 828 (2001). *De novo* review is required, however, when a state court incorrectly frames its legal analysis of a claim in light of clearly established Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 396-98 (2000) (analyzing *de novo* the prejudice prong of the *Strickland* test in relating to counsel's errors at sentencing); *Magana v. Hofbauer*, 263 F.3d 542, 551 (6th Cir. 2001)(engaged in *de novo* review of ineffective assistance of counsel claim because court concluded state court's legal formulation of defendant's burden of proof to prove prejudice was not just a reasonable probability but an absolute certain the outcome of the proceedings would have been different).

Credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). A habeas petitioner may rebut

the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

## II.    PROCEDURAL HISTORY

Petitioner was indicted in a multi-count indictment charging him with the October 20, 2003, especially aggravated kidnaping of Charlene Hyatt; vandalism of Charlene Hyatt's automobile in a amount between $500.00 and $1,000.00; the especially aggravated kidnaping of Brian Hyatt, Jr.; the especially aggravated kidnaping of Shera Holt; the especially aggravated kidnaping of Melissa Proctor; the especially aggravated kidnaping of Bobby Holt; the especially aggravated kidnaping of Robin Holt; the vandalism of Sue Hyatt's automobile in an amount between $500.00 and $1,000.00; and the October 21, 2003, premeditated first-degree murder of Brian Hyatt, his wife's alleged boyfriend [Addendum No. 1, Vol. 1, pp. 1-4].  Petitioner was convicted of three counts of false imprisonment, two counts of vandalism, and one count of premeditated first degree murder by a Bradley County jury on October 7, 2004 [Addendum No. 1, Vol. 1, pp 40-48].  Petitioner was sentenced on November 15, 2004, to an effective sentence of life imprisonment [Addendum No. 1, Vol. 2, pp. 29-39].

Petitioner's motion for new trial was denied on July 29, 2005 [Addendum No. 1, Vol. 2, at p. 57].  Petitioner then filed a direct appeal to the Tennessee Court of Criminal Appeals.  On November 9, 2006, the Tennessee Court of Criminal Appeals affirmed the judgments of the trial court. *State v. Shelton*, E2005-00214-CCA-R3-CD, 2006 WL 3246100 (Tenn. Crim. App. Nov. 9, 2006), *perm . app. denied* (Tenn. March 12, 2007).

Petitioner subsequently filed a state post-conviction petition on November 16, 2007 (Court File No. 10, p. 3), which was amended on November 4, 2008, after counsel was appointed [Addendum No. 3, Vol. 1, p. 10-11]. Following an evidentiary hearing on four alleged instances of ineffective assistance of counsel, the post-conviction court denied relief on February 12, 2009 [Addendum 3, Vol. 1, pp. 17-26]. On December 28, 2009, the Court of Criminal Appeals of Tennessee affirmed the denial of post-conviction relief. *Shelton v. State*, E2009-00582-CCA-R3-PC, 2009 WL 5083495 (Tenn .Crim. App. Dec. 29, 2009), *perm. app. denied* (Tenn. May 12, 2010). On or about August 11, 2010, Petitioner filed the instant habeas federal petition (Court File No. 2).

## III.     FACTUAL BACKGROUND

The facts of the crime will be taken from the appellate court's opinion on direct review. The facts presented in the state post conviction hearing will be taken from the appellate court's opinion affirming the denial of petitioner's state post-conviction petition.

### A.      Facts from Criminal Trial

The facts as to the conviction which is before this Court are taken from the appellate court's opinion affirming the convictions and sentence:

> The State's proof at trial revealed that Melissa (Missy) Proctor, who was the appellant's cousin, and her boyfriend, Robert Holt, lived at 1341 Overhead Bridge Road in Cleveland with their two minor children, Robin and Bobby.[1] On the night of October 20, 2003, Proctor and her children were home, and Robert was at work. Robert's daughter, Charlene Hyatt (hereinafter "Mrs. Hyatt"), brought her two minor children, Shera Holt and Brian Hyatt, Jr., to visit. Thereafter, the appellant and his wife, Natalie Shelton (hereinafter "Mrs. Shelton"), also came to visit. The appellant repeatedly asked the whereabouts of Mrs. Hyatt's husband, Brian Hyatt. The appellant thought Brian might be there because two vehicles Brian typically drove, one of which he owned with his wife and the other his mother owned, were parked

---

[1]     Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

in front of Proctor's mobile home. Proctor told the appellant that Brian was still at work with Robert. The appellant said that he had been told that his wife and Brian were having an affair, "and he had come to hurt him real bad" or "mess [him] up." During the conversation, Mrs. Shelton appeared scared and was crying. The appellant was "pacing back and forth, going in and out of the trailer." He told everyone present that they must stay in the home. The appellant would occasionally check to make sure everyone remained in the home. Those inside did not feel free to leave.

Robert came home at approximately 9:00 or 9:30 p.m. The appellant was outside, pacing. Robert did not see the appellant's car. When Robert asked about the car, the appellant explained that he had hidden it at the mobile home behind Robert's. The appellant told Robert that he was going to kill Brian. The appellant vandalized Brian's vehicles, rendering them inoperable so Mrs. Hyatt could not leave. The appellant then called the house of Mrs. Hyatt's mother and stepfather, where Mrs. Hyatt and Brian were living at that time. The appellant left a message for Brian, advising that Mrs. Hyatt's car was "messed up," and Brian needed to pick her up at Robert's home. Afterward, a neighbor, Audrey Conner, and Robert talked to the appellant, attempting to calm him. The effort seemed to work. The appellant left with his wife at 11:00 or 11:30 p.m. Robert's other two daughters came by the mobile home to take Mrs. Hyatt and her children home.

The next morning, at 6:10 or 6:20 a.m., the appellant, accompanied by his wife and two children, returned to Proctor's home. The appellant said that he was waiting for Brian to arrive, believing Brian would be riding to work with Robert. The appellant again threatened to kill Brian. Robert left for work at just after 6:30 a.m., but the appellant stayed until 8:30 a.m. While there, he paced constantly across the floor and would not sit. When the appellant got ready to leave, he told Proctor, "We are going up on the hill."

The appellant went to Brian's house and beat on the kitchen door and windows. Brian got out of bed, picked up a pair of bolt cutters, and started out of the bedroom. Mrs. Hyatt told Brian to put the bolt cutters down, and he complied. Brian went into the yard, with no weapon in his hands. The appellant was standing in the yard, and his wife was in the driveway, sitting in the driver's side of the appellant's car.

Brian asked the appellant what he was doing there. The appellant said, "You know what I'm doing here." The appellant hit Brian on the side of his head with a baseball bat then stabbed him in the chest. Brian fell back into the open kitchen door. The appellant told Mrs. Hyatt "[k]ind of in a smart aleck way" to call 911. The appellant left when he heard sirens approaching. Brian died as a result of his injuries.

The defense proof at trial was substantially similar to the proof adduced by the State. The only difference was the testimony of Natalie Shelton which reflected that the

6

appellant told her that Brian came toward him with a knife prior to the stabbing. Mrs. Shelton was unsure of whether Brian had a weapon during the fight. The appellant did not testify at trial.

Based upon the foregoing, the jury found the appellant guilty of first degree premeditated murder; the false imprisonment of Charlene Hyatt, Brian Hyatt, Jr., and Shera Holt; and two counts of vandalism of property in an amount less than $500. On appeal, the appellant challenges the trial court's denial of a motion to sever the kidnapping counts from the murder count, the trial court's failure to admit Mrs. Shelton's "complete" statement to police, and the sufficiency of the evidence supporting his conviction for first degree premeditated murder. We will address each of these issues in turn.

*State v. Shelton,* 2006 WL 3246100, at *1 -2.

## B.      Facts from Post-Conviction Hearing

A summary of the evidence from Petitioner's state post-conviction proceedings is set forth in the opinion of the Tennessee Court of Criminal Appeals affirming the post-conviction court's denial of his petition as follows:

On November 16, 2007, the petitioner filed a timely petition for post-conviction relief alleging that he had been denied the effective assistance of counsel, primarily because his trial counsel "was laboring under a conflict of interest." An amended petition for post-conviction relief filed by post-conviction counsel specified that trial counsel "failed to present proof of [the petitioner's] previously diagnosed mental illness in an effort to negate the element of pre-meditation," that trial counsel "failed to present significant proof of [the petitioner's] intoxication through both drugs and alcohol at the time of the killings [sic] in an effort to negate the appropriate mental capacity to form premeditation," that trial counsel "failed to object to the [trial court's] charge that intoxication did not apply to First Degree Murder and failed to raise this issue on appeal," that trial counsel "failed to have [the petitioner] sign a written waiver of conflict as to his representation of the alleged victim," and that trial counsel "failed to properly prepare the record on [the petitioner's] appeal thereby waiving crucial issues."

At the November 6, 2008, evidentiary hearing, the petitioner's maternal aunt, Marlene Boles, testified that she raised the petitioner after his mother passed away when he was five years old. She recalled that the petitioner had difficulty processing his mother's death, which had occurred at the hands of his stepfather while he and his younger brother were present. She stated that her mother initially gained custody of the two boys, and she and her mother took the petitioner to a psychiatrist.

7

According Ms. Boles, the psychiatrist explained that the petitioner's "mind, when he was eight-year-old, had froze; it was still what it was at five. He could not face the fact and say that his mother was deceased." Ms. Boles recalled that the petitioner claimed that his mother played with him. She stated that the petitioner had received some kind of mental health treatment consistently since 1978. She testified that she explained the petitioner's mental health history to trial counsel.

Ms. Boles testified that although trial counsel subpoenaed her to trial, she was never called as a witness. She recalled that as she sat outside the courtroom, she observed trial counsel speaking with members of Brian Hyatt's family on one occasion during the petitioner's second trial.[2] During cross-examination, Ms. Boles admitted that trial counsel spoke to the Hyatt family only after she told him that members of the family had threatened the petitioner's wife.

The petitioner testified that trial counsel told him that trial counsel "was representing Brian Hyatt on a burglary charge, but that wouldn't be any problem." The petitioner stated that he "had a problem with" trial counsel's having represented Brian Hyatt and with what he deemed trial counsel's friendly rapport with Mr. Hyatt's family. The petitioner recalled that after his first trial ended in a mistrial, he asked the trial court to appoint different counsel "because of ... the way things [were] unfolding." He added, "So he denied it. When he did, I decided right then that I wasn't gonna testify until I got a post-conviction, because I felt that, ... to be perfectly honest, I felt I was getting screwed." According to the petitioner, when he brought his concerns to the attention of the trial court, the court told him that "if [he] couldn't hire an attorney right then, that [he] was keeping the attorney that [the trial court] gave [him]."

The petitioner testified that he submitted to a mental health evaluation prior to trial. He stated that he never discussed his previous mental illness with trial counsel. The petitioner stated that he informed trial counsel that he had been drinking alcohol and smoking crack cocaine on the night of the kidnapping. Despite this information, trial counsel failed to call witnesses to support the petitioner's claim of voluntary intoxication. The petitioner admitted, however, that "[a]in't nobody knowed [sic] that but me and Audrey Conner, and we was in her house." The petitioner added that trial counsel failed to object when the trial judge instructed the jury that "[i]ntoxication does not apply to the first degree murder charge."

---

[2]     Apparently, the petitioner's first trial ended in a mistrial. (This was footnote number one (1) in the state appellate court opinion).

8

Additionally, the petitioner testified that his counsel failed to preserve an evidentiary issue for appeal regarding the admission of a pretrial statement given by his wife to police. He also claimed that counsel failed to object to the prosecutor's inflammatory closing argument and also failed to raise the issue on appeal. The petitioner claimed that the prosecutor told the jury, "[I]f I came to his house at seven o'clock in the morning, beating on his doors and windows, that a steak knife would be the least of my worries because I would be looking down the barrel of a .12 gauge shotgun, and he would separate me from my body with lethal force, and have no remorse doing so."

Trial counsel, District Public Defender for Bradley County, testified that he began representing the petitioner following his appointment to the case in general sessions court. Trial counsel stated that at the time of Brian Hyatt's death, Mr. Hyatt "was under indictment in Bradley County for a theft[] that involved his father-in-law" and that the public defender's office had been appointed to represent him. According to trial counsel, although he had previously represented Mr. Hyatt on a charge of felony vandalism, he "had not personally spoken to Mr. Hyatt" about the pending theft charge. Trial counsel recalled that "there was an outstanding *capias* for [Mr. Hyatt's] arrest at the time that he was killed." He testified that he informed the petitioner of his previous representation of Mr. Hyatt and of his office's appointment to Mr. Hyatt's pending case. Trial counsel stated that although the petitioner appeared "very suspicious of the quality of his representation by the Public Defender," trial counsel did not believe that a conflict of interests existed because "[t]here was no connection at all" between the two cases. Trial counsel testified that even though he was aware of the information from the outset of their relationship, the petitioner raised no objection until the second day of trial. Counsel recalled that the petitioner filed a disciplinary complaint with the Board of Professional Responsibility regarding the alleged conflict and that the Board ruled "that no conflict existed at the time this case was tried."

Trial counsel testified that he met with Ms. Boles and that she informed him that the petitioner "had been treated for some mental health difficulties." He stated that as a result of this information, he asked for a mental health evaluation for the petitioner. Trial counsel recalled that the petitioner did not want to undergo the evaluation alone, so trial counsel attended the examination with the petitioner. Trial counsel stated that despite the petitioner's having been diagnosed with post-traumatic stress disorder, trial counsel "never had any concerns about his competency to stand trial." He explained, "I knew from sitting in on the evaluation that a defense of insanity could not be supported. I knew they could not support a defense of diminished capacity. I did not seek an independent expert." Trial counsel testified that he knew that the petitioner had been drinking on the night of the kidnapping but said that he did not recall the petitioner's telling him that he had "ingested anything further" before returning to Mr. Hyatt's residence the following morning. Trial counsel stated that

he did not believe that neither the petitioner's mental health issues nor his voluntary intoxication rose to the level of a defense to Mr. Hyatt's homicide.

Trial counsel testified that he and the petitioner made the decision together to pursue a theory of self-defense and that the petitioner's decision, made during trial, not to testify "undermined that defense." Trial counsel stated that he told the petitioner that it was "very important" that he testify and that because the State had not filed notice of any convictions with which it intended to impeach the defendant, "[t]here was no reason for him not to testify." Trial counsel recalled that he found out on the second day of trial that the petitioner did not intend to testify. Trial counsel stated that the petitioner's decision forced the defense to rely on the testimony of the petitioner's wife. He testified that Ms. Shelton's testimony was weakened by her pretrial statement to police, which he characterized as "good and bad" and "contradictory in places."

Trial counsel testified that, with the petitioner's decision not to testify, the defense lost any testimony regarding the petitioner's level of intoxication at the time of Mr. Hyatt's murder. Counsel recalled that he questioned Ms. Conner, with whom the petitioner claimed to have been drinking and using cocaine, about the use of drugs and alcohol but that Ms. Conner denied using either.

Trial counsel admitted that he made a mistake by failing to ask that Ms. Shelton's entire statement be made an exhibit to her testimony. He explained that the prosecutor cross-examined Ms. Shelton with the most damaging portions of the statement and that the prosecutor made those portions of the statement an exhibit. Trial counsel stated that he did not similarly ask that the rest of the statement be made an exhibit to satisfy the rule of completeness. He insisted, however, that he had questioned Ms. Shelton about the substance of her statement. Nevertheless, he admitted that because he had failed to exhibit the whole of the statement to Ms. Shelton's testimony, he failed to perfect any issue regarding the statement for review on appeal.

During cross-examination, trial counsel again admitted his mistake in failing to exhibit Ms. Shelton's entire statement to her testimony, but he stated that he could not say that "there was anything in the statement that wasn't made part of the record that ... would have altered the outcome of the case." The bigger problem, in trial counsel's estimation, was the petitioner's refusal to testify and "corroborate part of the things that his wife testified to."

Trial counsel reiterated that although he was aware of the petitioner's previous mental health issues, he was not "overly concerned about mental illness." He stated that the petitioner gave a very detailed account of the offenses, leading counsel to believe that the petitioner suffered no problems with his memory. Trial counsel stated that the petitioner's excellent recall of the details belied any claim that he suffered from diminished capacity due to voluntary intoxication. Trial counsel testified that the murder of Mr. Hyatt followed the false imprisonment at Ms. Connor's residence by approximately nine hours. Trial counsel explained that

10

although the petitioner told him that the petitioner had used drugs and alcohol on the night of the false imprisonment, after Ms. Connor's denial and the petitioner's refusal to take the stand, trial counsel had no way to get any further proof of the petitioner's alleged intoxication into the record.

Trial counsel admitted that although he did not believe there was a conflict of interests regarding his previous representation of Mr. Hyatt, "it would have been better for [the petitioner's] peace of mind if [trial counsel] would have brought that to the [c]ourt's attention." Trial counsel explained that he was surprised when the petitioner raised the issue on the second day of trial because he "thought we were sort of beyond that issue."

*Shelton v. State,* 2009 WL 5083495, at *2 -5.

## IV.    ANALYSIS

Petitioner asserts the state court's decision denying him relief on his ineffective assistance of counsel claims was contrary to or involved an unreasonable application of clearly established Federal law (Court File No. 2). Petitioner raises four specific instances of alleged ineffective assistance of counsel.

### A.    Ineffective Assistance of Counsel Claims

First, Petitioner claims counsel ineffectively failed to present proof of his previously diagnosed mental illness, i.e., post traumatic stress disorder, in an effort to negate the element of premeditation, even though counsel was aware to his mental health history. Second, Petitioner claims counsel was ineffective for failing to present proof of his intoxication at the time of the killing in an effort to demonstrate he was unable to form the culpable mental element of premeditation, and for failing to object to the Court's instruction that intoxication did not apply to first degree murder. Third, Petitioner contends he was denied effective assistance of counsel due to counsel's prior representation of the victim. Finally, in his fourth claim, Petitioner contends counsel failed to object to the prosecutor's argument that "[i]f that was my house at 7:00 in the

11

morning and somebody is out there beating on my door and my windows he would be looking down the holes of a double barrel shotgun, not a paring knife. I would separate him from his head with lethal force, and have no apology about it." [Addendum No. 1, Vol. 5, p. 450].

After addressing the applicable law, the Court will address each alleged instance of ineffective assistance of counsel.

**B.  Applicable Law**

In order to demonstrate ineffective assistance of counsel, a petitioner must show not only his attorney's representation fell below the standard of competence demanded of attorneys in criminal cases but also a reasonable probability that, but for the attorney's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *McMann v. Richardson*, 397 U.S. 759, 771 (1970). The *Strickland* test requires a defendant demonstrate two essential elements: (1) counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id*. at 687-88.

As the Sixth Circuit explained in *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993): "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *See also West v. Seabold*, 73 F.3d 81, 84 (6th Cir.), *cert. denied*, 518 U.S. 1027 (1996). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Id*. (quoting *Strickland*, 466 at 691) (citing *Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir. 1989), *cert.*

12

*denied*, 495 U.S. 961

(1990)).  There is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.

The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland,* 466 U.S. at 690.  Trial counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  A defendant's challenge to such decisions must overcome a presumption that the challenged actions might be considered sound trial strategy. *O'Hara*, 24 F.3d at 828.  Effective assistance of counsel is presumed, and the Court will not generally question matters involving trial strategy.  *See United States v. Chambers*, 944 F.2d 1253, 1272 (6th Cir. 1991) (citing *Strickland v. Washington*, 466 U.S. at 692), *cert. denied*, 502 U.S. 1112 (1992).

Therefore, to prove deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness under the then "prevailing norms of practice."  *Strickland*, 466 U.S. at 688.   When evaluating counsel's performance, the Court is mindful of the Strickland Court's instructions that "[t]here are countless ways to provide effective assistance of counsel.  Even the best criminal defense attorneys would not defend a particular client in the same way."  *Id*.   In addition, the American Bar Association ("ABA") Standards for Criminal Justice are "guides to determining what is reasonable."  *Rompilla v. Beard*, 545 U.S. 374, 387 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Strickland*, 466 U.S. at 688.

"[R]eviewing court[s] must remember that 'counsel is strongly presumed to have rendered

13

adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Wong v. Money*, 142 F.3d 313, 319 (6th Cir. 1998), (quoting *Strickland v. Washington*, 466 U.S. at 690). The Court must make an independent judicial evaluation of counsel's performance, and determine whether counsel acted reasonably under all the circumstances. *O'Hara*, 24 F.3d at 828; *Ward v. United States*, 995 F.2d 1317, 1321-22 (6th Cir. 1993).

"Reviewing courts focus on whether counsel's errors have undermined the reliability of and confidence that the trial was fair and just." *Austin v. Bell*, 126 F.3d 843, 847 (6th Cir. 1997) *cert. denied*, 523 U.S. 1079 (1998) (citing, *Strickland*, 477 U.S. at 687; *United States v. Cronic*, 466 U.S. 648, 658, (1984)). To establish the prejudice prong, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

1.    *Failure to Present Evidence of Petitioner's Mental Health*

Petitioner complains that counsel failed to present proof of his previously diagnosed mental illness, i.e., post traumatic stress disorder, even though counsel was aware of his mental issues.[3] Petitioner contends he has a documented history of mental problems going back to 1975 as the forensic evaluation given in preparation for trial reflected the following:

> TEAM Medical Records indicated that he [petitioner] was seen there in 1974 but his records are unavailable. He received outpatient psychiatric treatment at Hiawassee Mental Health Center from 6-25-01 to 12-14-01 and from 11-27-02 to 2-10-03. Mr. Shelton [the petitioner] was diagnosed with Post Traumatic Stress Disorder and Alcohol Dependence by Dr. Troy Gilson. He was hospitalized at Moccasin Bend

---

[3]    Petitioner witnessed his mother being shot and killed by his drunk step-father when he was five years old. Sadly, one of Petitioner's six year old twins and his four year old child were in the car at the scene when the instant murder occurred.

14

Mental Institute once around 1995 for a suicide attempt. He was diagnosed with Adjustment Disorder with Depressed Mood, Alcohol Dependence, Marijuana Dependence, Major Depression without Psychotic Features, and Post Traumatic Stress Disorder by Dr. Won Park. He was seen on 12-20-95 for a psychiatric evaluation at Tennessee Dept. Of corrections – Dewberry and was diagnosed with Polysubstance Dependence and PTSD.

(Court File No. 2, p. 3).

Respondent argues that trial counsel's decision to pursue a claim of self-defense, with which Petitioner agreed at the time, and the decision not to pursue a defense of insanity or diminished capacity, is exactly the type of tactical decision which the *Strickland* Court held will not be second guessed. Therefore, the state court decision was neither contrary to, nor an unreasonable application of clearly established federal.

The state appellate court adjudicated the claim as follows:

The petitioner contends that trial counsel erred by failing to present proof of his previously diagnosed mental illness to negate the element of premeditation. The petitioner failed to present proof at the evidentiary hearing, however, to establish that he suffered from a mental illness that would, in fact, have negated the *mens rea* element of first degree murder. The petitioner's aunt testified that he suffered from post-traumatic stress disorder following the death of his mother when he was a young child and that he had periodically been under the care of a physician for mental illness. She did not testify, however, that the petitioner was under a doctor's care at the time of the murder of Mr. Hyatt. Further, trial counsel testified that he requested a mental health evaluation based on Ms. Boles's statements to him regarding the petitioner's mental health and that the evaluation confirmed his belief that the petitioner's capacity was not diminished by mental illness and that he was competent to stand trial. The petitioner presented no proof at the evidentiary hearing to support his claim that he was suffering from a mental disease or defect at the time of the offenses that would have diminished his capacity to form the necessary *mens rea* for the crimes. In consequence, he has failed to establish that trial counsel performed deficiently by failing to present proof of his mental illness at trial.

*Shelton v. State,* 2009 WL 5083495, at *7.

During the post-conviction evidentiary hearing trial counsel explained that he was aware Petitioner had been treated for some mental health issues as he had spoken with Ms. Boles, the

relative that testified during post-conviction that he had received mental health treatment as a result of seeing his drunk step-father kill his mother when he was five years old. That was one of the reason counsel had Petitioner evaluated. Counsel further explained:

> Mr. Shelton, as he stated, did not want to undergo that mental evaluation by himself. I was present with him when he was examined at Hiwassee Mental Health during the entire interview. I will say, Your Honor, that during my represen - -, even though I was aware that he had had some difficulties, that he'd been diagnosed with post-traumatic stress syndrome, that he'd had troubles with alcohol, I never had any concerns about his competency to stand trial. I never had any concerns about his ability to relay to me what did or did not happen. Mr. Shelton, during the entire course of my representation, was very adamant, very specific about what did and did not occur during the course of the entire event for which he was tried for. He disputed the State's proof, of course, and what the witnesses would say, but he was very specific with me and Mr. Donaldson as to what occurred or didn't occur. There was never a period where he said, "I can't recall," or, "I blacked out," or anything of that nature, that he had any trouble recalling the events. He was able to recall the events.
>
> . . .
>
> I knew from sitting in on the evaluation that a defense of insanity could not be supported. I knew they could not support a defense of diminished capacity. I did not seek an independent expert. I know that's something that can be second guessed, but the thrust of this case, the decision was made by me as trial counsel that it was not a knowing homicide, that it was self-defense.

[Addendum No. 3, Vol. 2, pp. 74-79]. Trial counsel further explained that although he knew Petitioner had mental health problems, he did not believe the problems "rose to the level of a defense." [Addendum No. 3, Vol. 2, p. 83].

The record clearly supports counsel's strategic decision not to try to introduce evidence of Petitioner's previously diagnosed mental illness to negate the element of premeditation, but instead to proceed with self-defense, as does the law. Although "evidence, including expert testimony, on an accused's mental state, is admissible in Tennessee to negate the elements of specific intent, including premeditation and deliberation in a first-degree murder case," *State v. Phipps*, 883 S.W.2d

16

138, 149 (Tenn. Crim. App. 1994), such evidence must "not be proffered as proof of 'diminished capacity.' Instead, such evidence should be presented to the trial court as relevant to negate the existence of the culpable mental state required to establish the criminal offense for which the defendant is being tried." *Hall v. State*, 958 S.W.2d 679, 690 (Tenn. 1997).

Petitioner's medical and mental health records do not meet the Tennessee admissibility requirements as there is nothing in them indicating Petitioner was unable to form the requisite intent to commit first degree premeditated murder [Addendum No. 3, Vol. 3, Appendix E]. Indeed, the October 28, 2003, Volunteer Behavioral Health Care System Crisis Assessment, which was conducted seven days after the murder, indicates that, although Petitioner was having an episode of reliving the murder situation while in jail requiring the calling of the crisis response team, he did not meet the criteria for in-patient treatment. Moreover, there is noting in that report that indicates his mental state prevented him from forming the requisite culpable mental intent for first degree premeditated murder.

Thus, upon review of the record, the Court cannot say that the state court's application of *Strickland* standard was unreasonable in concluding Petitioner failed to establish trial counsel performed deficiently by failing to present proof of his mental illness. Notably, during his post-conviction evidentiary hearing, Petitioner failed to present any expert testimony that his mental illness negated the existence of the culpable mental state required for premeditated murder, and the

Court has not located any such evidence in the record. Thus, even assuming counsel was deficient in this regard, Petitioner has not demonstrated he suffered any prejudice.

Accordingly, because the state court's decision was not based upon an unreasonable

determination of the facts in light of the evidence before it or an unreasonable application of *Strickland,* the claim that counsel failed to present proof of Petitioner's mental illness will be **DISMISSED.**

    2.     <u>*Failure to Present Evidence of Petitioner's Intoxication*</u>

Next Petitioner claims trial counsel ineffectively failed to present proof of his voluntary intoxication at the time of the murder to negate the element of premeditation and object to the trial court's instruction that the defense of intoxication did not apply to the first degree murder charge. Respondent contends that no evidence of Petitioner's intoxication at the time of murder exists; thus, the state court decision is clearly supported by the record.

The state post-conviction appellate court resolved the issues as follows:

*II. Petitioner's Intoxication*

The petitioner also claims that trial counsel was ineffective by failing to present proof of the petitioner's voluntary intoxication at the time of the murder in effort to negate the element of premeditation. Again, however, the petitioner failed to present evidence that he was, in fact, intoxicated at the time of the murder. The petitioner testified that he and Audrey Connor consumed alcohol and crack cocaine on the evening before the murder, but he admitted that this consumption preceded the murder by several hours. In his brief, the petitioner points to his own testimony at the evidentiary hearing as proof of his intoxication, but the petitioner had refused to testify at trial. Further, Ms. Connor, with whom the petitioner claimed to be using drugs and alcohol, denied using drugs with the petitioner. In consequence, there was no evidence of intoxication that trial counsel could have presented. Trial counsel will not be held responsible for failing to present proof that simply did not exist at the time of trial.

*III. Trial Court's Instruction on Intoxication*

The petitioner complains that trial counsel erred by failing to object to the trial court's instruction that its instruction on voluntary intoxication did not apply to the charge of first degree murder. As discussed above, however, there was simply no proof that the petitioner was intoxicated at the time he killed Mr. Hyatt, and there was no proof that the petitioner's earlier intoxication affected his mental capacity at the time of the murder. Accordingly, the trial court correctly concluded that an instruction on intoxication as to that offense was not warranted. *Harrell v. State*, 593 S.W.2d 664, 672 (Tenn.Crim.App.1979) (holding that any instruction on voluntary

18

intoxication is not warranted unless there is "evidence that the intoxication deprived the accused of the mental capacity to form specific intent" and observing that "[t]he determinative question" is what was the defendant's "mental capacity"). Because the trial court's instructions were a correct statement of the law as applied to the present case, trial counsel did not perform deficiently by failing to object to the instruction at trial or challenge it on appeal.

*Shelton v. State,* 2009 WL 5083495, at *7-8.

During the post-conviction evidentiary hearing, when asked whether he considered Petitioner's alcohol and drug use as a parallel defense with self defense, defense counsel explained:

> I didn't . . . I anticipated Mr. Shelton testifying. Maybe I relied too much on the fact that I believed he was going to testify. And I knew when he took the stand, he was going to be real specific about what occurred after he and his wife returned home. They spent time around, I think a pond or a lake, reconciling, had sexual relations, trying to have a good relationship with his wife. They went to bed a few hours. He set an alarm to get up so that he could go confront Mr. Hyatt. His child was sick, wanted to take the child to the doctor. I knew that's what he was going to testify to at trial. That's what I thought he was going to testify to at trial. So I thought that, at least to my thinking, that that [sic] would undermine a mental health defense, because he was so specific about what happened and why. Obviously the concern is he had a motive to kill the deceased, because he believed that the man was having an affair with his wife. Obviously that was a grave concern. The State had a motive. In hindsight, maybe I could have pursued a different defense, but all along it was that he had no intention of killing him when the stabbing occurred. And because he was able to be so specific about the events; he was always oriented in time and place when these events happened that I thought - - I do not think that a jury would find that as mitigation. There wasn't a period where he had any loss of memory or blackout or couldn't recall. He was always very specific about what he did, that witnesses were lying. "That's not, that didn't occur," that, "I never made threats to kill the deceased. I just was upset and wanted to confront him." I mean, we had many discussions about that. And my thinking is if he testified to that that [sic] it would be, that a jury would see that he was, like I said, oriented in time and place and rational, at least to some extent, when these occurrences occurred.

[Addendum No. 3, Vol. 2, pp. 102-103].

During trial, Audrey Mae Conner testified she knew Petitioner and saw him the night before the murder at her house and he was acting "[h]igh" which was unusual. Petitioner left but then she heard glass breaking and went outside where she found him near a car cutting the tires. She told him

to stop, he cussed her, and then she let him use her phone. After he used her phone, Petitioner refused to give it back because he was afraid she would call the police. Although the Court is unable to find this witness denied using drugs with Petitioner, as the state appellate court stated, Petitioner failed to present this witness, whom he presumably alleges will confirm he was using drugs and alcohol the night before the murder, during his state post-conviction evidentiary hearing [Addendum No. 1, Vol. 3, pp. 154-166]. Although his wife testified he had been drinking on Saturday before the murder, she did not testify he had been drinking on Monday, October 20, 2003, or the day of the murder which occurred on Tuesday, October 21, 2003 [Addendum No. 1, Vol. 4, p. 342]. In her statement to police after the murder, she denied her husband was "taking any drugs or anything like that" on Sunday [Addendum No. 1, Exhibit 22, p. 6].

Nevertheless, because Ms. Conner testified he acted high on the night of the alleged kidnapings, the court, over the State's objection, gave a voluntary intoxication instruction in relation to the crimes that were committed the day before the murder [Addendum No. 1, Vol. 5, pp. 381-82; 410-411]. The Court gave the following instruction:

> Included in the defendant's plea of not guilty to the charges of especially aggravated kidnapping and the lesser included offenses therein is his plea of intoxication as a defense. You have heard evidence concerning the alleged intoxication of the defendant at the time of the alleged offense.

> Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and, while in that condition, commits an act which would be a crime if he or she were sober, he or she is fully responsible for his or her conduct. It is the duty of persons to refrain from placing themselves in a condition which poses a danger to others.

> "Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

> "Voluntary intoxication" means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause

intoxication was known or ought to have been known.

Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.

In this case, the state must prove beyond a reasonable doubt the required culpable mental state of the defendant which is knowingly.

If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense of especially aggravated kidnapping.

If you are satisfied beyond a reasonable doubt that the defendant possessed the culpable mental state then you must find him not guilty of especially aggravated kidnapping.

Intoxication does not apply to the first degree murder charge.

[Addendum No. 1, Vol. 5, pp. 409-411].

During post-conviction proceedings, trial counsel testified there was no proof Petitioner consumed any alcohol between the time of the kidnaping and the murder [Addendum No. 3, Vol. 2, p. 124]. A careful review of the trial transcript reveals there is no evidence Petitioner ingested any intoxicant between the time of the kidnapping and the murder the next day. There is no testimony concerning this topic except Ms. Conner's testimony that he was acting high on the evening of the kidnaping [addendum No. 1, Vol. 3, p. 156, line 11].

Clearly, the state court's rejection of this claim is supported by the record. There simply is no credible evidence in the record that Petitioner was intoxicated at the time he committed these crimes. Counsel believed there was sufficient credible evidence Petitioner was sober at the time of the murder to justify not presenting this defense and pursued self-defense as Petitioner's defense. Counsel's decision to forego the intoxication defense is not outside the ambit of strategic decision

21

recognized by *Strickland*.

Likewise, counsel's failure to object to the Court's jury instruction excluding the intoxication defense from the murder charge is not deficient performance as such an argument would have been groundless since there is no evidence of his intoxication at the time of the murder. Counsel does not perform deficiently by failing to make a frivolous objection. *See generally Smith v. Robbins,* 528 U.S. 259, 282 (2000) (noting counsel has an ethical duty as officer of the court not to present frivolous arguments); *Green v. United States,* 23 F.3d 406 (6th Cir. 1994), *available at* 1994 WL 144435, *2 ("Trial counsel is not required to make frivolous objections to avoid a charge of ineffective representation.") (citing *Krist v. Foltz,* 804 F.2d 944, 946-47 (6th Cir. 1986)).

Petitioner's failure to present any credible evidence during his state post-conviction evidentiary hearing he was intoxicated at the time of he commission of any these crimes is fatal to these claims. Thus, even if counsel performed deficiently in failing to present evidence of his intoxication or object to the instruction, which the Court does not find, Petitioner has failed to demonstrate any resulting prejudice as there is no evidence before the Court from which it can conclude there is a reasonable probability the jury would have accepted the voluntary intoxication defense. The evidence clearly demonstrates Petitioner's cognitive skills were not so impaired that he was prevented from premeditating or forming the intent to kill,[4] and that his motor skills were not so impaired that the stabbing of the victim or hitting him in head with a baseball bat was not intentional. The record supports this conclusion as there is no evidence Petitioner ingested any intoxicant close to the time of committing the murder.

---

[4] Petitioner's wife statement to police reflected she told them the morning of the murder Petitioner continued telling her he was going to kill the victim, and she believed he went over there with the intent to kill the victim [Addendum No. 1, Vol. 4, pp. 349, 359].

22

Accordingly, because Petitioner has not demonstrated the Tennessee Court of Criminal Appeals adjudication of these claims were contrary to, or involved an unreasonable application of clearly established federal law, or was based upon an unreasonable determination of the facts in light of the evidence before the state court, his claims that counsel was ineffective for failing to present evidence of his intoxication and object to the jury instruction that intoxication did not apply to the murder charge will be **DISMISSED**.

3.      *Conflict of Interest*

Petitioner alleges trial counsel was ineffective for failing to notify the trial court or obtain a signed waiver of any conflict of interest in relation to counsel's prior representation of the murder victim, Brian Hyatt. Petitioner contends he was prejudiced by this "potential conflict." (Court File No. 2, pp. 4-5).

During post-conviction proceedings, Petitioner testified counsel advised him he had represented the victim, Brian Hyatt on a burglary charge, but it would not be a problem. As the Court understands Petitioner's post-conviction testimony, during his first trial, which ended in a mistrial, the State raised the issue of trial counsel's prior representation of the victim and Petitioner also filed a motion to dismiss counsel complaining counsel had spoken to Sue Hyatt and two other individuals earlier. That motion, however, was denied [Addendum No. 3, Vol. 1, p. 25]. Petitioner also testified he raised the issue on the second day of the second trial but the trial court refused to appoint new counsel [Addendum No. 3, Vol. 1, p. 26.[5]

_____

[5]      The record reflects that during the trial of this matter, Petitioner complained to the court that counsel was speaking to the victim's family, and that counsel "represent[ed] Brian Hyatt at the time he took this case." [Addendum No. 1, Vol. 3, p. 203]. Counsel responded he had not talked to the victim's family since the trial started, Petitioner retorted he had witnesses, and counsel told the court he could put on this proof but he had not talked to the family and had no reason to talk

23

During post-conviction proceedings trial counsel explained his prior representation of the victim as follows:

> Brian Hyatt is the deceased in this case. Brian Hyatt was a, is, was a person who had previously been represented by the Public Defender's office at the time of his death. The Public Defender's office had a case that we were appointed on at the time of his death. My recollection is that Mr. Hyatt had been found guilty of, I believe, a felony vandalism; had been placed on probation. At some point, he'd been revoked on that sentence and had to serve the sentence. So I personally did know him. I think I actually represented him on that previous case. At the time of the homicide, Mr. Hyatt was under indictment here in Bradley County for a, I believe it was a theft, that involved his father-in-law, Robert Holt, who was a witness for the State in the homicide case. Mr. Hyatt had been indicted; the Public Defender had been appointed. I had not personally spoke to Mr. Hyatt about that case. I was not present when he was arraigned. I did not discuss the case with him. At some point after the Public Defender was appointed, he failed to appear in court, so there was a - - my recollection is there was an outstanding *capias* for his arrest at the time that he was killed.

[Addendum No. 3, Vol. 2, pp. 69-70]. Counsel testified he informed Petitioner of the prior representation of Mr. Hyatt and that counsel did not believe there was any conflict of interest in representing Petitioner as the cases were unrelated. Counsel testified Petitioner subsequently filed a disciplinary complaint with the Board of Professional Responsibility regarding the alleged conflict and the Board ruled that no conflict of interest existed at the time the case was tried because there was no connection between the two cases [Addendum No. 3, Vol. 2, pp. 70-73].

The post-conviction appellate court rejected Petitioner's claim as follows:

> In his final claim, the petitioner asserts that he was denied the effective assistance of counsel at trial because trial counsel, who had previously represented Mr. Hyatt in

---

to them about anything. At that time, Petitioner also complained, as best as the Court can discern, that counsel did not file the same discovery motion Randy Rogers had filed in some other case and that counsel had not gone over every single piece of evidence with him. Petitioner also complained that he was concerned about the confidentiality of their jailhouse meetings. The trial court concluded that unless Petitioner wanted to hire somebody that day to step in, the trial would resume. The trial resumed [Addendum No. 1, Vol. 3, pp. 196-209].

a criminal case, was operating under an actual conflict of interests. In addition, he claims that trial counsel's failure to procure a written waiver of the conflict entitles him to post-conviction relief.

Prejudice will be presumed in cases where the petitioner has established that his trial counsel " 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). As the Court explained,

> [I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.

*Id.* (citation omitted). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.' " *State v. White*, 114 S.W.3d 469, 476 (Tenn.2003) (citing *State v. Culbreath*, 30 S.W.3d 309, 312–13 (Tenn.2000) (quoting Tenn. R. Sup.Ct. 8, EC 5–1)). "The proper focus is solely upon whether counsel's conflict affected counsel's actions." *Netters v. State*, 957 S.W.2d 844, 848 (Tenn. Crim. App.1997).

Again, the petitioner failed to adduce any proof at the evidentiary hearing to support his claim that trial counsel was burdened by an actual conflict of interests. Trial counsel's accredited testimony established that he had previously represented Mr. Hyatt in a criminal case some years before he was killed by the petitioner. Trial counsel also testified that his office had been appointed to represent Mr. Hyatt on a criminal charge that was pending at the time of Mr. Hyatt's death but that neither he nor any other attorney from his office had met with Mr. Hyatt regarding the pending charge. Trial counsel insisted that he did not believe there to be a conflict of interests and that he revealed his previous representation of Mr. Hyatt to the petitioner as soon as he was appointed to the petitioner's case. Nothing suggests that trial counsel's representation of the petitioner was colored by his previous representation of Mr. Hyatt. To the contrary, the record establishes that counsel zealously represented the petitioner. Because the petitioner has failed to establish that trial counsel was burdened by an actual conflict of interests that adversely affected his representation of the petitioner, he is not entitled to relief on this issue.

Similarly, we fail to see how trial counsel's failure to procure a written waiver of the perceived conflict adversely affected the outcome of the trial. Although it might have been preferable to obtain a written acknowledgment of trial counsel's previous

25

> representation of Mr. Hyatt, because the previous representation did not, in this instance, rise to the level of a conflict of interests, no written waiver of the conflict was necessary. As such, the failure to obtain a written waiver under these circumstances did not render counsel's assistance ineffective.

*Shelton v. State,* 2009 WL 5083495, at * 8.

First, Petitioner failed to demonstrate to the trial court or post-conviction court that counsel's previous representation of the victim gave rise to a conflict. Second, he failed to show the alleged conflict of interest actually affected his lawyer's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 349-350 (1980). In *Mickens v. Taylor*, 535 U.S. 162 (2002), the Supreme Court found that the presumed prejudice standard of *Cuyler v. Sullivan* was clearly established only in the situation of a conflict of interest due to multiple concurrent representation. *Id.* At 175; *see also Stewart v. Wolfenbarger*, 468 F.3d 338, 351 (6th Cir., 2006) (The Sixth Circuit "has consistently held that, for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases, including successive representation, the *Strickland*, standard applies").

Petitioner fails to demonstrate how his counsel's previous representation of the victim constitutes an actual conflict. While trial counsel previously represented the victim in an unrelated proceeding where the victim was being criminally prosecuted, counsel did so years before his representation of Petitioner. Although counsel had recently been appointed to represent the victim, no meeting ever took place between them as the victim failed to show for his court appearance, and Petitioner murdered him before he was ever arrested on the *capias*.

Petitioner argues he was prejudiced because counsel had contact with the victim's family during trial, and counsel was prohibited from disclosing information, such as the victim's propensity for violence, by the attorney client privilege (Court File No. 2). As previously noted, trial counsel

26

denied having any contact with the victim's family at the time Petitioner brought it up during trial [Addendum No. 1, Vol. 3, p. 203]. Petitioner's witness, Marlene Boles (his maternal aunt) testified during the post-conviction evidentiary hearing that during the first trial when she and Petitioner's wife were sitting on the bench, "a lot of the Hyatts were out here by this door, and they all came out of the room, and Richard and everybody was talking together. It was all the Hyatts. I was sitting there, and Natalie, and it was when they said it was a mistrial? [sic]" Ms. Boles also testified during the second trial she told counsel the Hyatts' had threatened Natalie and counsel and the witness walked down to Natalie and he was taking to Natalie and the Hyatts came up behind her and "they" started talking and the witness walked away [Addendum No. 3, Vol. 2, p. 19-20]. This vague, non-specific testimony indicates, if anything, any conversation counsel had with the Hyatts' was to protect Petitioner's wife. Nevertheless, this testimony amounts to nothing more than innuendo and speculation. Petitioner's claim of conflict is speculative and unconvincing. Moreover, Petitioner has failed to present any evidence of anything counsel did or failed to do in the conduct of his defense which demonstrates any conflict of interest arising from his prior representation of the victim, Brian Hyatt, in two completely unrelated criminal matters.

The Sixth Circuit has instructed that "where the two representations were successive, the conflict . . . is not actual, but rather attenuated." *Watkins v. Lafler,* 517 Fed.Appx. 488, 498 (6th Cir. 2013). Once Petitioner killed the victim, counsel's representation of the victim ended, although it is questionable whether it ever actually began. Counsel subsequently was appointed to represent Petitioner after the death of the victim. Thus, it appears the *Strickland* standard applies. *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) (for § 2254 cases, the *Sullivan* standard does not apply to claims of conflict of interest other than multiple concurrent representation; in such cases,

including successive representation, the *Strickland* standard applies).

There is nothing before the Court demonstrating trial counsel was burdened with divided loyalties between Petitioner and the victim. When the trial court inquired, Petitioner did not demonstrate counsel had a conflict and the record does not reflect there was an actual conflict or that counsel's previous representation of the victim adversely affected him while representing Petitioner. The Supreme Court has held "the possiblity of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. at 350. This, Petitioner has failed to do.

In sum, Petitioner has failed to demonstrate counsel had a conflict under *Cuyler*. Even assuming counsel's failure to notify the court of his prior representation of the victim and obtain a written from Petitioner was deficient, Petitioner has failed to demonstrate he suffered any prejudiced as a result of the alleged deficiency under *Strickland,* as he has not demonstrated a reasonable probability that, but for counsel's alleged deficiency, the outcome of the trial would have been different. Thus, Petitioner has failed to support his claim for ineffective assistance of counsel under either *Cuyler* or *Stickland.* Accordingly, because the state court's decision is not based upon an unreasonable determination of the facts nor is it contrary to, or an unreasonable application of federal law, Petitioner's claims that counsel had a conflict and failed to have him sign a waiver will be **DISMISSED.**

4.    *Counsel's Failure to Object to Prosecutor's Arugment*

In his fourth claim, Petitioner contends counsel was ineffective for failing to object to the Prosecutor's argument. During closing, the following argument was made by the Prosecutor:

And so you are in your house at 7:00 in the morning asleep and your are awaken, and Mr. Donaldson says he come knocking on the door. He wasn't out there knocking on the door, he was pounding on the door and the window. And Ms. Hyatt knew what was there, the threat to her safety and her children and her husband and she begged him to stay in the bedroom, but you know, he had to be some measure of a man, he went out to find out what the ruckus was about, and let me tell you something, I don't care if he did have the paring knife. If that was my house at 7:00 in the morning and somebody is out there beating on my windows he would be looking down the holes of a double barrel shotgun, not a paring knife. I would separate him from his head with lethal force, and have no apology about it. So I don't even care if their theory is right.

[Addendum No. 1, Vol. 5, pp. 449-450].

Petitioner did not raise this claim on post-conviction appeal. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners to exhaust their claims in state court before raising them in federal court. 28 U.S.C. § 2254(b)(1)(A). To meet the exhaustion requirement, a petitioner must "fairly present" his claims through "one complete round of the State's established appellate review process[.]" *O'Sullivan v. Boerckel,* 526 U.S. 838, 844 (1999). To fairly present a claim, the petitioner must clearly state the federal basis and federal nature of the claim, along with relevant facts. *Anderson v. Harless,* 459 U.S. 4, 6-7 (1982).


Petitioner did not raise this claim in the Tennessee Court of Criminal Appeals. Consequently, it is procedurally barred absent a showing of good cause for his failure to exhaust the claim and prejudice from the purported constitutional violation, or a showing that failure to hear the claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750 (1991). Petitioner has not alleged any cause for his default or any resulting prejudice or miscarriage

of justice.  Accordingly, review of this claim is procedurally barred and it will be **DISMISSED**.[6]

## V.    CONCLUSION

Petitioner  is  not  entitled  to  an  evidentiary  hearing,  and  his  §  2254  petition  will  be

**DISMISSED** (Court File No. 2).

A judgment will enter.

/s/_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

---

[6]        Notably, to be cognizable, a prosecutor's statement must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986).  That is not what we have here.  Nevertheless, even assuming for the sake of discussion the claim is properly before the Court and counsel performed deficiently in his failure to object to the argument, Petitioner has not raised a viable claim as he is unable to demonstrate prejudice i.e., a reasonable probability, that but for counsel's failure to object to the argument, the outcome of the trial would have been different.